14-CV-01109-CMP

___ FILED ___ ENTERED
___ LODGED ___ RECEIVED

JUL 21 2014  DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY_____ DEPUTY

SEA 65126 No Summons Issued

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| United States of America, *ex rel.* TJ Gallo,<br><br>Plaintiff,<br><br>v.<br><br>RPM Mortgage, Inc.,<br><br>Defendant. | Civil Action No: **CV14 1109 TSZ**<br><br>**FALSE CLAIMS ACT COMPLAINT**<br><br>**JURY DEMAND**<br><br>*FILED IN CAMERA AND UNDER SEAL* |

## I. INTRODUCTION

1. This is a civil action brought by TJ Gallo, a *qui tam* Relator, on behalf of the United States of America, to recover treble damages and civil penalties under the False Claims Act, as amended. 31 U.S.C. §§3729 *et seq.*

2. This action arises from RPM Mortgage, Inc.'s, ("RPM") knowing presentation of false records and certifications to the Federal Housing Administration ("FHA") and the United States Department of Housing and Urban Development ("HUD"), certifying that RPM was in full compliance with HUD regulations when it submitted mortgage loans it had originated for insurance under FHA and HUD programs. These false records and certifications were material to the United States' decision to insure those loans and its incurring the obligation to pay FHA insurance claims on defaulted home loans originated by RPM and its branch offices.

COMPLAINT AND DEMAND FOR JURY TRIAL - 1
Case No.

Foster Pepper PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-3299
Phone (206) 447-4400  Fax (206) 447-9700

51382055.2


ORIGINAL

3. RPM was founded in 1986 and is one of the nation's largest residential mortgage lending companies, employing approximately 800 loan officers and claiming to operate over sixty-five (65) "branch offices" located in Washington, California, Nevada, Texas, Colorado, Idaho, and Oregon. In 2013, RPM was reported to be the fifth leading mortgage company in the United States with reported retail sales volume of nearly $6 billion. *See* http://www.scotsmanguide.com/TopLenders2013. According to a press report, in 2012 RPM loan agents closed more than 16,030 units for a total loan volume of $6,380,359,408. *"The Logeman Group Joins RPM Mortgage,"* Westlaw Marketwired (Sept. 4, 2013.). The same article notes the meteoric expansion of RPM's branch offices, stating it had opened 21 new branches in the preceding twelve months alone.

4. Among other things, RPM originates loans for home buyers that are then submitted for coverage under insurance programs administered by the FHA and HUD. HUD, through the FHA, insures lenders against losses to homebuyers. FHA insures approximately one third of all new residential mortgages in the United States and is the largest mortgage insurer in the world.

5. Under HUD's mortgage insurance program, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property. HUD incurs expenses in managing and marketing the foreclosed upon property.

6. By protecting lenders against defaults on mortgages, FHA mortgage insurance promotes home ownership and encourages lenders to make loans to millions of Americans who might not otherwise qualify for a mortgage. FHA mortgage insurance also makes the insured mortgage loans more valuable in the resale market.

7. The continued availability of FHA mortgage insurance requires that HUD accurately assess the risk of default on the loans it insures. To accomplish this task, HUD relies on certifications by lenders and loan originators that the loans they submit for insurance comply

COMPLAINT AND DEMAND FOR JURY TRIAL - 2
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

51382055.2

1 with HUD standards and guidelines specifically designed to mitigate the risk to HUD, including, most fundamentally, that the loan originated from a HUD-approved lender and a HUD-approved branch office.

8. From at least 2008 to the present, RPM originated thousands of HUD/FHA insured loans through its main and branch offices and repeatedly certified to HUD that it operated its loan operations and branch offices in compliance with HUD regulations. This was false. In fact, RPM knowingly operated its branch offices in flagrant violation of HUD regulations. When home loans originated by RPM's 800 loan officers in its 65 branch offices that were insured by the FHA later went into default, the United States suffered damages from the insurance payments it made on those defaulted loans.

9. When RPM sought approval from FHA and HUD for direct lending authority and for its branch offices, it lied to the United States government to obtain those approvals. Each time RPM filed an application, it falsely certified that the company and its branch offices met all HUD/FHA requirements. In fact, RPM's branch office operations violated multiple explicit and widely known requirements under HUD/FHA rules. RPM was under a continuing obligation to monitor and report immediately to HUD any violations of law or regulation, false statements, potential fraud, material deficiencies, or program abuses.

10. First, RPM maintained a corporate policy of requiring its branch offices to assume financial responsibility for their operating expenses, including responsibility for lease expenses, expenses for facilities, equipment, supplies, insurance costs, commissions, salaries, and benefits (including the branch manager's compensation). RPM also required its branch offices to indemnify RPM and hold it harmless for any and all liabilities, claims, losses, costs, expenses, penalties, fines, forfeitures, judgments, and damages arising out of or in connection with the operation of the branch office. This policy constitutes a prohibited "net branching" system that violated HUD requirements plainly laid out more than 14 years ago in HUD Mortgagee Letter

COMPLAINT AND DEMAND FOR JURY TRIAL - 3
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

00-15 (May 1, 2000) (the "HUD Net Branching Letter"). The HUD Net Branching Letter unequivocally provides that such arrangements are prohibited.

11. Second, RPM's certifications of compliance were also false because RPM maintained a "point bank" that is expressly prohibited by HUD regulations. A point bank is a means of expanding loan originator compensation and is defined as a "continuously maintained accounting balance of basis points credited to a loan originator by a creditor for originations. From the point bank, amounts are debited when spent by the loan originator to obtain pricing concessions from the creditor on a consumer's behalf for any transaction." 78 Fed. Reg. 11280, 11330, n. 87 (Feb. 15, 2013). Congress imposed limits on loan originator compensation in 2010. Since then, federal regulators have been consistent in their determination that there are no circumstances in which maintaining a point bank is a permissible form of loan officer compensation. *Id.* at 11330. The use of a point bank violates the loan officer compensation rules in 12 C.F.R. § 1026.36(d)(1).

12. RPM did not disclose its illegal net branching scheme or its prohibited point bank system to HUD. Because both are violations of HUD rules, RPM's certifications to HUD that the information contained in each of its respective applications submitted to HUD for insurance were "true to the best of the lender's knowledge and belief" were, in fact, false.

13. RPM was under a continuing obligation to monitor and report immediately to HUD any violations of law or regulation, false statements, potential fraud, material deficiencies, or program abuses. *See* HUD's Direct Endorsement (DE) Program Lender Approval Handbook, 4155.2 1.B.8.a (March 24, 2011). Relator is informed, believes, and therefore alleges RPM did no such monitoring and made no such reports.

14. The Relator seeks, on behalf of the United States, the maximum amount of damages and the maximum amount of civil penalties allowed by law. Specifically, Relator seeks treble damages under the False Claims act and civil penalties of $11,000 for each false claim.

COMPLAINT AND DEMAND FOR JURY TRIAL - 4
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

51382055.2

## II.   JURISDICTION AND VENUE

15.   This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. § 1331.

16.   This Court has personal jurisdiction over RPM and venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) because the defendant transacts business in this judicial district by selling loans and operating a branch office in the district, and because acts proscribed by 31 U.S.C. § 3729 occurred in this district.

## III.   PARTIES

17.   Plaintiff/Relator, TJ Gallo, is a resident of Seattle, Washington. Mr. Gallo brings this action for violations of 31 U.S.C. § 3729, *et seq.* on behalf of the United States government pursuant to 31 U.S.C. § 3730(b)(1). Mr. Gallo was the owner and Chief Executive Officer of Premier Finance Group, Inc. ("Premier"), which was a mortgage lender located in Seattle. In May, 2013, Mr. Gallo, on behalf of Premier, executed a Marketing Services Agreement (MSA) with RPM. Under the terms of the MSA, Premier became a Seattle branch office of RPM.

18.   Defendant RPM Mortgage, Inc. is a California corporation, headquartered in Alamo, California. It has been registered to do business in Washington since January of 2008. RPM Mortgage is a privately-held mortgage lender. According to the Nationwide Mortgage Licensing System & Registry or Nationwide Multistate Licensing System, RPM is currently licensed in 11 states and has 65 active "branches."

19.   RPM does business in the Western District of Washington by, among other things, operating a branch office in Seattle and originating mortgage loans to consumers in the district.

## IV.   FACTUAL BACKGROUND

**A. HUD Lender Approvals and Certifications**

20.   Pursuant to the National Housing Act of 1934, the FHA offers various mortgage insurance programs. Through these programs, FHA insures approved lenders ("mortgagees")

COMPLAINT AND DEMAND FOR JURY TRIAL - 5
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

51382055.2

against losses on mortgage loans made to buyers of single family housing. The program helps low-income and moderate-income families become homeowners by lowering some of the costs of their mortgage loans. FHA mortgage insurance encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements.

21.     A HUD-approved direct endorsement lender, such as RPM, must be generally approved by HUD, and must also obtain HUD approval for each branch office from which the lender intends to originate HUD-insured loans. A direct endorsement lender is a lender who has received approval from FHA to close loans prior to submitting them to FHA for endorsement. *See* HUD's General Information on FHA Mortgage Insurance Programs, Handbook 4155.2, Ch. 1, §1.A.1.e and Direct Endorsement (DE) Program Lender Approval, Handbook 4155.2, Ch. 2, §2.b.2.a (March 24, 2011).

22.     To obtain HUD approval to originate FHA loans as a Direct Lender (DL), RPM was required to submit a form to HUD (HUD 92001-A) containing basic information about the company and making certain certifications under penalty of perjury. HUD relies on the sworn certifications, which, among other things, contain the following:

> 4. I certify that... neither applicant nor any of its principals, partners, officers... are: ...(g) In violation of any other requirement established by the Secretary;
>
> ...
>
> 10. I certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to... HUD's regulations, FHA handbooks, mortgagee letters... with regard to using and maintaining its FHA lender approval.
>
> ...
>
> I hereby certify that all of the information I have provided on this form and in any accompanying documentation is true and accurate to the best of my knowledge and belief. I acknowledge that if I knowingly have made any false, fictitious, or fraudulent statement, representation, or certification on this form or any accompanying documents, I, as well as the applicant, may be subject to administrative action, as well as civil and criminal penalties, including fines

COMPLAINT AND DEMAND FOR JURY TRIAL - 6
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

51382055.2

and/or imprisonment, under applicable federal law, including but not limited to 18 U.S.C §§ 1001, 1010, and 1012, and 31 U.S.C. §§3720 and 3802.

23. To obtain HUD approval to originate FHA loans from a specific branch office, RPM was required to submit a form to HUD (HUD Form 92001-B) containing basic information about the branch, and making certain certifications under penalty of perjury. HUD relies on the certifications, which, among other things, contain the following:

> 2. I certify this branch office meets all HUD/FHA requirements.
>
> 3. I certify that the staff of this branch office are employees of the lender which will pay all operating costs of the branch office including compensation of all employees.
>
> …
>
> I hereby certify that all of the information I have provided on this form and in any accompanying documentation is true and accurate to the best of my knowledge and belief. I acknowledge that if I knowingly have made any false, fictitious, or fraudulent statement, representation, or certification on this form or any accompanying documents, I, as well as the applicant, may be subject to administrative action, as well as civil and criminal penalties, including fines and/or imprisonment, under applicable federal law, including but not limited to 18 U.S.C §§ 1001, 1010, and 1012, and 31 U.S.C. §§3720 and 3802.

24. After submitting the certification, the lender receives a HUD ID that permits the branch to originate FHA loans. To monitor lender default rates on a branch-by-branch basis, HUD requires lenders to enter the specific HUD ID for the originating branch in every loan file submitted to HUD.

25. To maintain HUD-approved status, lenders such as RPM must also submit annual certifications to HUD. HUD Mortgagee Letter 2009-25 (August 24, 2009). HUD relies on the annual certifications, which are also made under penalty of perjury and which, among other things, contain the following:

> I certify that I know, or am in the position to know, whether the operations of the above named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters,… and policies; and
>
> …
>
> I certify that to the best of my knowledge, the above named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA

COMPLAINT AND DEMAND FOR JURY TRIAL - 7
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

approval, and that the above named lender is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators and all other employees conducting FHA business for the above-named lender in all of its offices where it performs any functions of an FHA-approved lender..

...

Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil, and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

26. Each loan file submitted for HUD insurance not in the direct lender program but in the conditional approval contains a loan-specific certification, HUD Form 92900-A, in which a lender certifies (for HUD's benefit and reliance) that the information contained in the application is "true to the best of the lender's knowledge and belief" and further certifies that the Lender makes "all certifications required for this mortgage as set forth in the (HUD Handbook)."

27. If a borrower defaults on an FHA-insured mortgage, the holder of the loan submits a claim to HUD for the costs associated with the defaulted mortgage and the sale of the property. HUD then pays off the balance of the mortgage and other related costs, and may assume ownership of the property. In the mortgage industry, HUD-insured loans are highly marketable for resale to investors both because such loans are expected to have met HUD requirements and because they are backed by the full faith and credit of the United States.

B. "Net Branches" Are Prohibited

28. By at least the 1990's some HUD/FHA lenders began the practice of taking on an existing, separate, mortgage company or broker as a branch and allowing that separate entity to originate insured mortgages under the approved HUD/FHA lender's HUD mortgagee number. This came to be known as a "net branching" arrangement. HUD was concerned that mortgagees who operate such arrangements have the potential to grow too fast, outpacing their internal

COMPLAINT AND DEMAND FOR JURY TRIAL - 8  
Case No.

FOSTER PEPPER PLLC  
1111 THIRD AVENUE, SUITE 3400  
SEATTLE, WASHINGTON 98101-3299  
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

control systems, making the arrangement inconsistent with HUD's strict requirements that mortgagees maintain close supervisory control over all employees.

29. In May 2000, HUD published Mortgagee Letter 00-15 (May 1, 2000), stating unequivocally that such arrangements are prohibited by HUD. The letter identified aspects and practices of these prohibited "net branching" arrangements. The characteristics of prohibited "net branches" were subsequently set out in HUD's Mortgage Approval Handbook, 4060.1 (Aug. 14, 2006).

30. The May 2000 letter and the Mortgage Approval Handbook require that HUD-approved lenders must pay all operating expenses of their branch offices, including the compensation of all branch employees. Although certain incentive compensation arrangements based upon "net profits" may be permissible, operating expenses must be paid by the HUD lender. Mortgagee Letter 00-15 states, "If the expenses are paid by the (HUD lender), the arrangement is acceptable. If, however, the expenses are paid by the branch manager from a personal or non-mortgage account (or by some third party) the arrangement is prohibited and a true branch does not exist." *Letter 00-15* at 2.

31. The HUD Mortgage Approval Handbook and the May, 2000 letter identify other specific characteristics of a prohibited "net branch." Among other things, prohibited arrangements include those that:

- Require all contractual relationships with vendors such as leases, telephones, utilities, and advertising to be in the name of the 'employee' (branch) and not in the name of the HUD/FHA approved mortgagee;

- Require the 'employee' (branch) to indemnify the HUD/FHA approved mortgagee if it incurs damages from any apparent, express, or implied agency representation or by or through the 'employee's' (branch's) actions; or

- Require the 'employee' (branch) to issue a personal check to cover operating expenses if funds are not available from the operating account.

*HUD Mortgagee Approval Handbook* at ¶2-14(B)(2006).

COMPLAINT AND DEMAND FOR JURY TRIAL - 9
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

### C. RPM's 65 Branch Offices Operated As Prohibited Net Branches

32. Relator is informed, believes, and therefore alleges that RPM has originated thousands of FHA loans out of its branch offices that operated illegally as "net branches" under terms similar or identical to those in RPM's Marketing Services Agreement ("MSA") with Premier dated May 17, 2013.

33. Among other things, RPM's MSA with Relator's company (Premier) provided that Premier must maintain an "over/under" account that was to be used to pay "any and every expense and/or to satisfy any indebtedness" incurred by the branch office. Mr. Gallo's branch office was required to maintain a minimum balance in the over/under account that was in an amount equivalent to two months of the office's general and administrative expenses. The over/under account was maintained with funds supplied by Mr. Gallo's branch office or, at times, by Mr. Gallo personally.

34. Under the terms of the MSA, RPM would pay the branch office on a monthly basis an amount equal to the branch office's "net profits," but only if, and only to the extent, that the funds maintained in the over/under account at the close of the month were equal to or exceeded the required minimum balance (i.e. two months of the office's expenses).

35. Furthermore, the MSA defined the term "net profits" to mean the branch's income less its expenses. The MSA defined expenses required to be paid by Premier to include, among other things, lease expenses; expenses for facilities, equipment and supplies; insurance costs; commissions, salaries, and benefits costs, including the branch manager's compensation; and any losses incurred by RPM as a result of any repurchase or threatened repurchase of a loan originated by the branch office. In addition, the MSA required the branch office to indemnify RPM and hold it harmless against "any and all liability, claims, losses, costs, expenses, penalties, fines, forfeitures, judgments and damages . . . arising out of or in connection with any matter which is a subject" of the agreement.

COMPLAINT AND DEMAND FOR JURY TRIAL - 10
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

36. By letter dated November 22, 2013 RPM terminated its MSA with Premier effective December 30, 2013, leaving Premier wholly responsible for payment of expenses incurred while Premier was operating as an RPM "branch" under the MSA including, but not limited to, payments to vendors, utilities, and office rent.

37. RPM's arrangement with Premier, memorialized by the MSA, was a "net branch" arrangement of the type that is expressly prohibited by HUD/FHA requirements. Relator is informed, believes, and therefore alleges that RPM operated most, if not all, of its branch offices as it operated Premier, as prohibited "net branches."

### D. RPM Deceived HUD About Its Illegal Net Branch Operations

38. When RPM submitted its application to become a HUD-approved direct lender it certified that it complied with HUD requirements. Those certifications were knowingly false because they failed to disclose that RPM operated its branches as prohibited "net branches" in violation of HUD requirements.

39. Each time RPM sought approval for one of its branch offices, it certified that it complied with HUD requirements and that it "paid the operating costs of the branch offices." These certifications were knowingly false. RPM instead maximized its profits by opening and collecting revenue from some 65 branches, while failing to supervise or assume financial responsibility for them.

40. Each time RPM submitted annual certifications to remain a HUD-approved lender it certified that it complied with HUD requirements. Those certifications were knowingly false because they failed to disclose that RPM operated its branches as prohibited "net branches" in violation of HUD requirements.

41. Each time RPM submitted an application for HUD insurance on a loan application not in the direct lender program but in the conditional approval program, RPM certified that it complied with HUD requirements. Those certifications were knowingly false because they

COMPLAINT AND DEMAND FOR JURY TRIAL - 11
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

1  failed to disclose that RPM operated its branches as prohibited "net branches" in violation of
2  HUD requirements.
3      42.    RPM had an ongoing responsibility to report to HUD such false certifications and
4  failed to do so. RPM provided all these false certifications knowing HUD would rely on them.

### E. RPM Deceived HUD By Failing to Disclose Its Use of a Prohibited Point Bank

43.    On July 21, 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Reform Act) was enacted into law, Public Law 111-203, 124 Stat. 1376. Among other provisions, Title XIV of the Reform Act creates new TILA Section 129B(c), which imposes restrictions on loan originator compensation. In 2011, the Board of Governors of the Federal Reserve System (the "Board") amended Regulation Z, 12 CFR Part 226, subsequently re-codified as 12 CFR 1026, to implement the loan originator restrictions in the Reform Act. 75 Fed. Reg. 58509 (Sep. 24, 2010) ("Reg Z"). The rule change became effective on April 6th, 2011. The compensation restrictions prohibit basing loan originator compensation on any of the transaction's terms or conditions. 12 CFR § 1026.36(d). This means, for instance, that a mortgage loan officer cannot receive compensation based on the interest rate of a loan or on the fact that the loan officer steered a consumer to purchase title insurance from an affiliate of the broker. The rule also prohibits loan originator compensation based on the profitability of a transaction or pool of transactions.

44.    The Board identified the practice of loan officers creating "overages" as a means for loan officers to have significant discretion over loan pricing, and therefore making them able to modify the loan's terms or conditions to increase their own compensation. 75 Fed. Reg. at 58517. The Board concluded that "where loan originators have the capacity to control their own compensation based on the terms or conditions offered to consumers, the incentive to provide consumers with a higher interest rate or other less favorable terms exists. When this unfair practice occurs, it results in direct economic harm to consumers whether the loan originator is a mortgage broker or employed as a loan officer for a bank, credit union, or community bank." *Id.*

COMPLAINT AND DEMAND FOR JURY TRIAL - 12  
Case No.

FOSTER PEPPER PLLC  
1111 THIRD AVENUE, SUITE 3400  
SEATTLE, WASHINGTON 98101-3299  
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

Thus, the use of "overages" was considered a prohibited practice under the new rules governing loan originator compensation since the effective date of the rule.

45. The Reform Act assigned jurisdiction of Reg Z to the Bureau of Consumer Financial Protection ("CFPB"). In 2012 the CFPB proposed amendments to Reg Z concerning loan officer compensation. 77 Fed. Reg. 55272 (September 7, 2012). The Bureau queried whether there were any instances where "overages" (described as "point banks" in the Supplementary Information) should be permissible. *Id.* at 55294. The CFPB concluded that there were no such instances and kept the broad prohibition of their use in place in the final rule. 78 Fed. Reg. 11280, 11330 (February 15, 2013).

46. The CFPB defines a "point bank" as "a continuously maintained accounting balance of basis points credited to a loan originator by a creditor for originations." *Id.* at 11330, n. 87. Since the effective date of the FRB's rules on April 6, 2011, there have been no circumstances in which maintaining a point bank was permissible. 12 C.F.R. § 1026.36(d)(1).

47. RPM operated an illegal point bank through what it called its Expense Account Manager ("EAM") fund. RPM established EAM accounts for each of its loan officers and allowed the loan officers to determine for themselves whether a consumer would be given a higher or lower interest rate and fee structure for their particular loan. This enabled RPM's loan officers to offer less sophisticated borrowers interest rates and fees on their home loans that were higher than RPM's established "par" rates. The loan officers' overages from RPM's par rates were tracked through the EAM accounts. The accrued overages of revenue helped RPM's loan officers fund loans for other privileged, savvier borrowers. In this way, RPM loan officers were able to use a previous consumer's higher interest rate and fee "over payment" to subsidize more sophisticated borrowers when the loan officers needed to sweeten deals to attract customers. In effect, the loan officers "bought the business" of the more sophisticated borrower using the "overage" from the less sophisticated borrower. RPM's loan officers used this "point bank" strategy to buy more clients and hence earn greater overall compensation.

COMPLAINT AND DEMAND FOR JURY TRIAL - 13
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

48. RPM did not disclose its illegal point bank system to HUD on any of its applications. Because a point bank is never permissible, RPM's certifications to HUD that, for example, the information contained in the respective applications submitted to HUD were "true to the best of the lender's knowledge and belief" were, in fact false. Had HUD known that RPM's certifications materially misrepresented the fact that it was operating an illegal point bank, HUD would have considered RPM's certifications fraudulent and not endorsed the mortgages it submitted for insurance. Accordingly, every loan RPM originated that was insured by FHA was materially based on RPM's knowingly false certifications. The United States suffered damages for each such loan on which it paid an FHA insurance claim and related expenses.

49. RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so. RPM provided all of these false certifications knowing HUD would rely on them.

## FIRST CLAIM

### Violations of False Claims Act
### (31 U.S.C. § 3729(a)(1)(B))
### False Certifications Regarding RPM's Net Branch System

50. Plaintiff/Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

51. By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for the purpose of falsely obtaining and inducing HUD's reliance in granting approval for RPM's branches, RPM knowingly caused to be made or used false certifications to HUD that it maintained its branches in compliance with HUD requirements, including that it paid the operating costs of the branches. RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so.

COMPLAINT AND DEMAND FOR JURY TRIAL - 14
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

52.     By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for the purpose of falsely obtaining its application to become a HUD-approved direct lender, RPM knowingly caused to be made or used false certifications to HUD that it maintained its branches in compliance with HUD requirements, including that it paid the operating costs of the branches.  RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so.

53.     By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for the purpose of maintaining its status annually as a HUD-approved lender, RPM knowingly caused to be made or used false certifications to HUD that it maintained its branches in compliance with HUD requirements, including that it paid the operating costs of the branches.  RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so.

54.     By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), RPM knowingly caused to be made or used false certifications to HUD that the loan files it submitted for HUD insurance not in the direct lender program but in the conditional approval were in compliance with HUD requirements, including that it paid the operating costs of the branches.  RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so.

55.     By submitting false certifications to HUD, RPM knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States.

56.     Relator is informed and believes the government paid insurance claims and incurred losses in an amount to be proven at trial relating to FHA-insured mortgages originated out of RPM's branches based on the misrepresentations made by RPM.

57.     Pursuant to the False Claims Act, 31 U.S.C. § 3729(a), RPM is liable to the United States under the treble damages and civil penalty provisions for a civil penalty of not less

COMPLAINT AND DEMAND FOR JURY TRIAL - 15
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

than $5,500 and not more than $11,000 for each of the false claims herein, plus three (3) times the amount of damages the United States sustained because of the defendant's actions.

## SECOND CLAIM

### Violations of False Claims Act
### (31 U.S.C. § 3729(a)(1)(B))
### False Certifications Regarding Use Of A Point Bank

58. Plaintiff/Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

59. By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for each of the loans originated by RPM and submitted to HUD for FHA mortgage insurance, RPM knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States by failing to disclose in loan documentation that it operated a point bank in violation of federal law and HUD requirements. RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so.

60. By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for the purpose of falsely obtaining HUD approval for RPM's branches, RPM knowingly caused to be made or used false certifications to HUD that it maintained its branches in compliance with HUD requirements, by failing to disclose that it operated a point bank in violation of federal law and HUD requirements. RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so.

61. By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for the purpose of falsely obtaining its application to become a HUD-approved direct lender, RPM knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States by failing to disclose that it operated a point bank in violation of federal law and HUD

COMPLAINT AND DEMAND FOR JURY TRIAL - 16
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

requirements. RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so.

62. By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for the purpose of maintaining its status annually as a HUD-approved lender, RPM knowingly caused to be made or used false certifications to HUD that it maintained its branches in compliance with HUD requirements, by failing to disclose that it operated a point bank in violation of federal law and HUD requirements. RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so.

63. By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), RPM knowingly caused to be made or used false certifications to HUD that the loan files it submitted for HUD insurance not in the direct lender program but in the conditional approval were in compliance with HUD requirements, by failing to disclose that it operated a point bank in violation of federal law and HUD requirements. RPM had an ongoing responsibility to report to HUD such false certifications and failed to do so.

64. By submitting false certifications to HUD, RPM knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim for payment or approval by the United States.

65. Relator is informed, believes, and therefore alleges that the government paid insurance claims and incurred losses relating to FHA-insured mortgages based on the misrepresentations that the mortgages were originated in accordance with HUD requirements.

66. Pursuant to the False Claims Act, 31 U.S.C. § 3729(a), RPM is liable to the United States under the treble damages and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false claims herein, plus three (3) times the amount of damages the United States sustained because of the defendant's actions.

COMPLAINT AND DEMAND FOR JURY TRIAL - 17
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2

WHEREFORE, Relator, on behalf of the United States, demands judgment against the defendant as follows:

1. For treble damages pursuant to 31 U.S.C. § 3729(a) in an amount to be determined at trial, plus an $11,000 penalty for each false claim presented to the United States;

2. Awarding attorneys' fees and costs pursuant to 31 U.S.C. § 3729(a);

3. That the case be tried to a jury;

4. For leave to amend the complaint freely; and

5. Such other and further relief as is just and proper.

DATED this 21st day of July, 2014.

Robert S. Mahler
s/John L. Bley
John L. Bley, WSBA #15230
s/Tim J. Filer
Tim J. Filer, WSBA #16285
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-3299
Telephone: (206) 447-4400
Facsimile: (206) 447-9700
Email: mahler@foster.com
bleyj@foster.com
filet@foster.com
Attorneys for Plaintiff

COMPLAINT AND DEMAND FOR JURY TRIAL - 18
Case No.

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

51382055.2